**Martin W. GODFREY, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

No. 98–4109–SAC.

United States District Court, D. Kansas.

Oct. 26, 1999.

Thomas O. Rost, Rost & Rost, Topeka, KS, for plaintiff.

Jackie A. Rapstine, Office of U.S. Atty., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This is an action to review the final decision of the defendant Commissioner of Social Security ("Commissioner") denying the claimant Martin W. Godfrey's applications for disability insurance benefits under Title II of the Social Security Act ("Act") and for supplemental security income ("SSI") under Title XVI of the Act. The case is ripe for decision on the parties' briefs filed pursuant to D.Kan.Rule 83.7.

## PROCEDURAL HISTORY

The claimant applied for disability benefits under Title II on March 18, 1996, asserting he had been disabled as of July 17, 1995. He also applied on March 18, 1996, for SSI, asserting the same disability date. His claims were denied initially and on reconsideration. At the claimant's request, a hearing before an administrative law judge ("ALJ") was held on January 10, 1997, and he appeared in person and with counsel. (Tr. 39–95). Witnesses at the hearing were the claimant and a vocational expert. The claimant amended his alleged onset date of disability to February 27, 1997. The ALJ subsequently issued his decision on September 18, 1997, finding that the claimant was not disabled as defined under the Social Security Act. The appeals council denied the claimant's request for review after also considering a letter from the claimant's attorney and a report dated September 23, 1997, from Dr. S. McKinney. Thus, the ALJ's decision stands as the Commissioner's final decision. *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994) (citing *See* 20 C.F.R. § 404.981).

## STANDARD OF REVIEW

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the Commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence

is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). "A finding of ' "no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence." ' " *Trimiar v. Sullivan,* 966 F.2d 1326, 1328 (10th Cir.1992)) (quoting *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir.1983) (quoting *Hemphill v. Weinberger,* 483 F.2d 1137 (5th Cir.1973)). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d at 858 (citation omitted).

The court's review also extends to determining whether the Commissioner applied the correct legal standards. *Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir. 1994). Besides the lack of substantial evidence, reversal may be appropriate when the Commissioner uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994).

The court's duty to assess whether substantial evidence exists:

"is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.' "

*Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler,* 760 F.2d 1052, 1055 (10th Cir.1985)). The court "must examine the record closely to determine whether substantial evidence supports" the Commissioner's determination. *Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir.1996). The court is not to reweigh the evidence or substitute its judgment for the Commissioner's. *Glass v. Shalala,* 43 F.3d at 1395. The court typically defers to the ALJ on issues of witness credibility. *Hamilton v. Secretary*

*of Health & Human Services,* 961 F.2d 1495, 1498 (10th Cir.1992). Nonetheless, " '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence....' " *Winfrey,* 92 F.3d at 1020 (quoting *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir.1988)). The courts do not mechanically accept the Commissioner's findings. *Claassen v. Heckler,* 600 F.Supp. 1507, 1509 (D.Kan.1985); *see Ehrhart v. Secretary of Health & Human Services,* 969 F.2d 534, 538 (7th Cir.1992) ("By the same token, we must do more than merely rubber stamp the decisions of the" Commissioner. (citation omitted)). Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the Commissioner's conclusions are rational. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985). " 'We examine the record as a whole, including whatever in the record fairly detracts from the weight of the ... [Commissioner's] decision and, on that basis determine if the substantiality of the evidence test has been met.' " *Glenn v. Shalala,* 21 F.3d 983, 984 (10th Cir.1994) (quoting *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 800–01 (10th Cir.1991)); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan,* 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). The claimant has the burden of proving a disability that prevents him from engaging in his prior work for a

continuous period of twelve months. *Trimiar*, 966 F.2d at 1329. The burden then shifts to the Commissioner to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir.1989). The Commissioner satisfies this burden if substantial evidence supports it. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir.1993).

A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). This process comes to an end if at any point the Commissioner determines the claimant is disabled or not. *Gossett*, 862 F.2d at 805. Step one is whether the claimant is currently engaged in substantial gainful activity. If not, the fact finder in step two decides whether "the claimant has a medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 141, 107 S.Ct. 2287. Step three entails looking at whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. If no equivalency, step four requires the claimant to show that because of the impairment he is unable to perform his past work. The final step is to determine whether the claimant has the residual functional capacity ("RFC") to perform other work available in the national economy, considering such additional factors as age, education, and past work experience. *See Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir.1988).

**ALJ'S FINDINGS**

In his order of September 18, 1997, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on February 27, 1996, his amended onset of disability, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since February 27, 1996.

3. The medical evidence establishes that the claimant has the following "severe" impairments: degenerative joint disease, right knee, post operative status, with mild residual effusion; mild disc bulge, lumbar spine at L4–L5 and LS–S1; and mild spondylosis, cervical spine. However, these impairments or combination of impairments do not meet or medically equal one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's allegations of a total inability to work were not entirely credible. The testimony of the vocational expert was credible.

5. The claimant retains the residual functional capacity to perform a restricted range sedentary work because he must alternate between sitting and standing as needed.

6. The claimant is unable to perform his past relevant work, either as he actually performed or as it is generally performed in the national economy.

7. The claimant is 39 years old, which is defined as a "younger individual" (20 CFR 404.1563 and 416.963).

8. The claimant has a "high school education or above" (20 CFR 404.1564 and 416.964).

9. The claimant does not have any acquired work skills, which are transferable to other occupations within his residual functional capacity (20 CFR 404.1568 and 416.968).

10. Using Vocational Rule 201.28, Table No. 1, Appendix 2, Subpart P, Regulations No. 4 as a framework, the claimant would be found "not disabled," if the claimant was able to perform the full range of sedentary work, based on the claimant's age, education, work experience

and Section 404.1529 and 416.969 of Regulations No. 16.

11. Using the above cited rule as a framework and the testimony of the vocational expert, there are other jobs existing in significant numbers in the national economy (20 CFR 404.1566 and 416.966) which the claimant could perform given his residual functional capacity.

12. The claimant has not been under a "disability" as defined in the Social Security Act, through the date of this decision 20 CFR 404.1520(f) and 416.920(f).

(Tr. 23–24).

## SUMMARY OF ARGUMENTS

The claimant argues that the ALJ erred in not including the side effects of his pain medication in the hypothetical questions asked of the vocational expert. The claimant next contends the vocational expert's testimony was flawed as being contradicted by the Dictionary of Occupational Titles and in being based on inadequate details concerning the sit/stand option. Finally, the claimant asserts the ALJ's credibility findings concerning the plaintiff's allegations of pain are not supported by substantial evidence. In his reply brief, the claimant argues for the first time that the objective medical evidence "is consistent with" the listed impairment of a "gross anatomical deformity of knee." (Dk.9, p. 15).

In his reply brief, the claimant also requests oral argument, but he offers no reasons in support of his request. After reviewing the briefs and the record on appeal, the court finds nothing novel or complex in the issues as argued in the briefs and revealed by the record. The court denies the request for oral argument, as it would not materially assist the court in reaching an informed decision.

## FACTS[1]

At the time of the hearing, the claimant was thirty-eight years of age and had earned a general equivalency degree. His past relevant work was as an automobile mechanic. The claimant orally amended his alleged onset date of disability to February 27, 1998, to be consistent with his employment history.

On July 25, 1995, the claimant was seen by his treating physician for right knee pain after an injury at work. Dr. Mumford observed moderate effusion, drained the knee, and waited to see if the symptoms returned. (Tr. 145). He released the claimant for light-duty or desk work only.

On August 14, 1995, Dr. Mumford performed an arthroscopic partial medial meniscectomy. (Tr. 143–44). As of September 8, 1995, Dr. Mumford observed that the claimant walked without a limp and unassisted and that his knee had a full range of motion. (Tr. 144). He was released for modified light duty work with lifting and standing/walking restrictions and "no bending, twisting, squatting or crawling." (Tr. 144). On October 17, 1995, Dr. Mumford made his impairment rating for this injury:

[A]t last follow-up, on September 8, 1995 he had achieved normal range of motion and strength. I feel that he has achieved maximum medical improvement and the following impairment has been calculated, based on AMA Guide to the Evaluation of Permanent Impairment, Third Edition (Revised), Table 40, ten (10) percent impairment of the lower extremity. From Table 46, this corresponds to a four (4) percent whole person impairment.

(Tr. 143).

On October 23, 1995, the claimant went to Michael Brady for a chiropractic treat-

---

1. In his original brief, the claimant chose not to state the facts as summarized from the record, and instead, he devoted most of his attention to arguing general propositions without any citation to the record. In his reply brief, the claimant did state the facts with citations to the record and then argued the issues with facts and citations to the record. Such a briefing practice is plainly improper and will not be tolerated in any future cases.

ment stating that he had been "working all weekend in [the] basement because it flooded." (Tr. 152).

On November 28, 1995, the claimant went to Dr. Mumford with complaints of low back pain. Dr. Mumford described the pain as "typically nonradicular" but with "occasional aching discomfort in the right buttock and right posterior thigh." (Tr. 143). The claimant told his physician that the pain had been present for years, and he had benefitted in the past from chiropractic treatments. Dr. Mumford also recorded that the pain was "typically activity related" and that the claimant said his work involved "vigorous activity" and "significant lifting." (Tr. 143). Dr. Mumford released the claimant for regular duty work and also recommended: a weight loss program, a "trunk flexibility and strengthening program," "[g]entle aerobic conditioning," "use of a corset while performing vigorous lifting activities," and "NSAIDS (Lodine 500 mg.)." (Tr. 143).

On January 3, 1996, the claimant returned to Dr. Mumford with complaints of intermittent back pain with a radicular component in both thighs and some groin discomfort. Dr. Mumford recorded: "This [pain] is subjectively progressive and subjectively disabling. I've recommended further work-up with an MRI." (Tr. 142). Dr. Mumford subsequently reviewed with the claimant the MRI that showed "degenerative disc disease at L4–5 and L5–S1. There is some mild bulging though there is no HNP and no impingement of the thecal sac or nerve roots." The physician recommended continuing the flexibility and strengthening program and prescribed Ultram for the claimant's "intermittent bad days." (Tr. 142).

Almost two months later on March 6, 1996, Dr. Mumford next saw the claimant on a follow-up examination on his back pain. The pain was described as radicular pain "over the posterior thigh and proximal calf region with some intermittent numbness." (Dk.142). Dr. Mumford scheduled an epidural steroid injection that occurred on March 12, 1996. Dr.

Mumford examined the claimant on March 18, 1996, noting that the injection had provided good relief of the radicular pain but that the "disabling low back pain" had not improved. The claimant told Dr. Mumford that he had lost his job due to absences caused by the back pain and that he was applying for social security benefits. At that time, Dr. Mumford prescribed for the degenerative disc disease a program of physical therapy three times weekly for two weeks. The claimant improved during the physical therapy program to the point that he resumed his exercising at home to increase flexibility and strength.

Dr. Brent Koprivica examined the claimant in consultation for his on-the-job injury. In his report dated January 17, 1996, Dr. Koprivica observed the following: "He is able to heel and toe walk adequately without spasticity. His gait is normal without the use of assistive devices." (Tr. 136). However, the claimant still limps as a result of the knee injury which seems to have increased his back pain. Dr. Koprivica concluded that the claimant had sustained a "permanent injury to the right knee" that did "not require any specific treatment" at that time. (Tr. 137). Another conclusion was that the claimant had aggravated his degenerative disc disease as "a result of the necessity to use crutches and canes associated with the knee injury." (Tr. 137). Dr. Koprivica wrote that the claimant's complaints of low back pain had increased but that the situation did not require any surgical intervention based on the information provided by the claimant. (Tr. 137).

In a letter dated December 19, 1996, Michael Brady, D.C., a chiropractor, wrote:

This is to verify that Mr. Martin Godfrey has required care in my office for spinal related problems. Martin was first seen on July 11, 1994 at which time he had mid back, low back, and neck pain. He has required care off & on since then. He has also had to miss

work periodically. He is unable to work at this time due to his back condition. His diagnosis is lumbar disc syndrome and cervical spinal degeneration. Results of cervical MRI on December 5, 1996 were negative. However, plain film Radiographs reveal disc degeneration and dsteophyte formations at multiple levels.

(Tr. 168).

On April 9, 1997, Dr. Robbie Logan examined the claimant as a consultation requested by the government. His report noted that the claimant had "DJD [degenerative joint disease] at L4 or L5 and osteophyte formation, with wedging of disc space at L5 and disc thinning also noted at L5." (Tr. 169). It was also noted that the claimant occasionally experienced a "pinched nerve in the neck associated with headache." (tr. 169). He observed that the claimant was able to get on and off the table but ambulated with a cane. His diagnostic impression was:

1.) Right knee DJD, status post partial meniscal tear and repair. Patient continues to have mild effusion and loss of range of motion with knee discomfort.

2.) DJD of L–S spine, patient again has decreased range of motion, complains of pain and findings on x-ray.

3.) Cervical spondylosis, patient has functional range of motion, no complaint of pain at the present.

4.) History of high blood pressure treated with diet.

(Tr. 170).

Following the ALJ's decision, the claimant was examined by Sharon McKinney, D.O., who wrote a report dated September 23, 1997, and addressed to the claimant's attorney. McKinney observed:

GAIT: With ambulation he limps to the right in regular gait. He can barely walk on his heels, toes or tandem and is somewhat precarious with these gait patterns. He moves a little stiffly in the hips and spine particularly noticeable when getting up and down from a chair or on and off the table.

LOW BACK: Range of motion is adequate. He has pain in the buttocks with straight leg raising at about 75 to 80 degrees. He has a lot palpable tension in the low back muscles....

LOWER EXTREMITIES: Range of motion is a little limited in rotation of the hips....

NECK: Range of motion is adequate as is strength.

(Tr. 182–83). McKinney's impression was that the claimant had fibromyalgia, "myoligamentous strains to the low and mid back," muscle problems with "the right posterior hip girdle," and "significant degenerative disc disease at L3–4, L4–5 and LS–S1 although there are no specific herniated disc but there is disc bulging at L4–5 and L5–S1 with some impact on the thecal sac." (Tr. 183). McKinney opined that the claimant was "really pretty limited by this myoligamentous problems" as his muscles would hurt with heavy usage and his hip girdle muscles would not support him in activities requiring heavy lifting and movements like stair climbing, squatting or bending. McKinney offered that the fibromyalgia would limit the amount of time that the claimant could sit or stand and limit his ability to bend, climb stairs and ladders. He can stand for only ten minutes several times a day. "As to more sedentary activities he really can't do anything repetitive without his muscles screaming at him. He doesn't have much in the way of sedentary skills and since he can't sit very long he is even further limited." (Tr. 184). McKinney noted that as to overall impairment ratings from these injuries Dr. Koprivica in March of 1996 gave a 9% whole person impairment rating while Dr. Mumford in October of 1995 gave a 4% whole person impairment rating. (Tr. 184). McKinney further wrote:

I don't find anything to disagree with in either of these reports although I think there is additional problems with the fibromyalgia as it leads to more generalized difficulties with functioning than just the back or knee problems would

cause. He also has strain residuals of the posterior hip girdle which further aggravates both his back, knee and general difficulty with physical functioning. Because of these two injuries I think he has more restrictions than given by Dr. Koprivica or Dr. Mumford.

(Tr. 184).

At the hearing, the claimant testified that he takes ibuprofen and Ultram for his neck and back pain. The claimant described the side effects of this medication to be "indigestion and gas and cramps, drowsiness and dizziness." (Tr. 195). The claimant said the medications kept him "from doing anything, really, because" he is "too drowsy and dizzy all the time." (Tr. 195). He said the Ultram particularly caused him to sleep during the day and interfered with his concentration. (Tr. 195). The claimant testified that his girlfriend or daughters cook for him and when they don't cook then he eats microwave dinners. The claimant sees his chiropractor and takes medications for his neck and back pain. At the time of the hearing, the claimant was not receiving any additional treatment for these conditions.

Janice Hastert, a vocational rehabilitation consultant, testified at the hearing. She observed that the claimant did not acquire any skills from his past relevant work that were transferable to less demanding work. She was asked to assume that the claimant had a knee injury and some neck and low back pain with "some bilateral radiculopathy," that the claimant took pain medication that caused dizziness and drowsiness, that the claimant could not lift or carry objects that weighed more than ten pounds and could carry frequently only objects weighing two to three pounds, and that the claimant would need the option to sit or stand at his discretion to relieve discomfort. (Tr. 206). Given those assumed restrictions, Ms. Hastert testified that the claimant could perform "a variety of sedentary jobs" that included cashier, electronics assembler, optical goods assembler, photo finisher, phone solicitor, and security monitor. (Tr. 206–07). When asked to assume the claimant's con-

ditions were as he had testified, Ms. Hastert said the claimant would not be able to perform any of these jobs, because migraine headaches left him bedridden and his concentration was impaired by the pain and the medication. (Tr. 207–08).

**MOTIONS TO SUPPLEMENT (Dks. 15 and 16)**

■ Finally, the claimant has filed two motions in this court seeking to supplement the record with additional medical evidence. The first motion to supplement was not accompanied by any medical evidence, nor did it describe the nature of any such evidence. The second motion is accompanied by an office note from Dr. John Ebeling, which states in relevant part:

Martin is referred by Dr. Yorke for a second opinion as to the possibility of fusion for chronic lower back pain....

. . . . .

Review of his plain films shows some mild degenerative changes with some anterior spurs at L3–4. Alignment is good. MRI scan degenerated discs at L3–4, L4–5, and L5–S1. There are some mild bulges, but certainly no herniations. No signs of stenosis, nerve root, or cauida equina compression.

I think he has a mechanical back pain syndrome due to his degenerated lower three lumbar discs. I would not recommend discectomies. I think that given his situation that multi-level fusion would probably not result in significant relief and be worth the risks to consider. I discussed this with him. I would continue conservative therapies. I really don't think further epidural injections would be of much utility as they don't seem to have changed the situation much.

(Dk.16). The claimant does not request a sentence six remand based on this evidence. The proper format for presenting new evidence is a sentence six remand. As the claimant seeks no remand, the court denies the claimant's motions to supplement. Alternatively, the claimant has

not made the required showing in the district court to justify remand for material evidence. *See* 42 U.S.C. § 405(g).

## ANALYSIS

◼ The ALJ determined here that the plaintiff could not return to his past relevant work but that he still could perform the jobs identified by the vocational expert. Once the claimant establishes his incapacity to perform his past work before his insured status expired, it becomes the Commissioner's burden to show that the claimant retained the RFC to do other work that exists in the national economy. *Thompson,* 987 F.2d at 1487. The ALJ found the plaintiff's medically determinable impairments to be: "degenerative joint disease, right knee, post operative status, with mild residual effusion; mild disc bulge, lumbar spine at L4–L5 and L5–S1; and mild spondylosis, cervical spine." (Tr. 24). There is substantial evidence of record to support this description of the plaintiff's medically determinable impairments. As for the plaintiff's RFC, the ALJ found:

> that the claimant retains the residual functional capacity to perform a restricted range of sedentary work. The claimant should not lift more than ten pounds at a time. He may, however, be required to occasionally lift office articles such as docket files, ledgers, and small tools. The claimant should not sit more than six hours in a eight-hour workday nor should he stand and/or walk more than two hours in an eight-hour workday. The claimant should be given the option to sit and/or stand when the need arises.

(Tr. 22) The overriding issue on appeal is whether this RFC finding is supported by substantial evidence. The court finds that the record does contain substantial evidence.

*Does the evidence establish that the claimant's knee condition meet one of the listed impairments?*

◼ In his reply brief, the claimant argues for the first time that the objective medical evidence "is consistent with" the listed impairment of a "gross anatomical deformity of knee." (Dk.9, p. 15). The claimant quotes the following from the category of arthritis of a major weight-bearing joint found at 20 C.F.R. Pt. 404, Subpt. P, App. 1: "Gross anatomical deformity of hip or knee (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk and stand." The claimant points to Dr. Mumford's description of the x-rays. The court cannot infer from that description, particularly Dr. Mumford's comment that "AP and lateral radiographs of the knee are unremarkable," that significant space narrowing or bony destruction is evidenced by the x-rays. The claimant's argument is not supported by the evidence of record.

*Has the ALJ erred in not including the side effects of the pain medication in the hypothetical question to the vocational expert?*

◼ The claimant argues the medical record does not support the ALJ's apparent finding of no serious side effects from the pain medication. The court is not persuaded by this argument. The ALJ's question to the vocational expert did recognize that the claimant experienced "some side effects of dizziness and drowsiness from the medications." (Tr. 206). The ALJ, however, did not believe the claimant that the side effects were so serious as to require him to lay down or sleep during the workday or as to impair his ability to concentrate on the basic duties of his work. (Tr. 208). There is substantial evidence in the record to support this finding.

In a daily activities report dated March 23, 1996, the claimant disclosed that he was taking two pain medications, ibuprofen (800 mg—3 each day) and Ultram (50 mg—2 each day), prescribed by Dr. Mumford and that the medications caused him no side effects. (Tr. 104). In May of 1996, the claimant changed his position

and reported that the same two prescriptions at the same rate caused him drowsiness. (Tr. 110). In December of 1996, the claimant again reported drowsiness from these same two prescriptions with Ultram being taken at the rate of one to three times daily. (Tr. 69). Other than drowsiness reported on these later two reports, there is no mention of the other four side effects to which the claimant testified at the hearing.

The medical record does not show that the claimant ever complained about any side effects or even discussed them with his treating physician, Dr. Mumford. Nor does the record show that any physician was asked to adjust the medications to minimize any alleged side effects. No physician ever directed the claimant to restrict any of his activities because of these pain medications. In fact, Dr. Mumford first prescribed these pain medications when the claimant was employed as a mechanic, and the claimant's employment was not terminated because of poor work or falling asleep on the job. "Thus, the claimant did not present objective medical evidence that any side effects from her medication were in fact limiting." *McKenzie v. Chater*, 69 F.3d 548, 1995 WL 649690, at *2 (10th Cir. Nov.6, 1995) (Table). Moreover, the court will not second-guess the ALJ's decision to discount the claimant's belated, inconsistent and unsubstantiated complaints about the side effects from his pain medication. *Fritz v. Chater*, 69 F.3d 547, 1995 WL 656982, at *2 (10th Cir.1995) (Table). Substantial evidence supports the ALJ's determination that the claimant's ability to work was not limited by any significant side effects of the medication. Consequently, the ALJ's hypothetical question properly reflects the ALJ's assessment of the claimant's limitations. *See Decker v. Chater*, 86 F.3d 953, 955 (10th Cir.1996) (While hypothetical questions to the vocational expert must precisely reflect impairments, "they need only reflect impairments and limitations that are borne out by the evidentiary record").

Based on his testimony at the hearing that Dr. Spencer prescribed these pain medications, the claimant contends the ALJ erred in not obtaining Dr. Spencer's records with regard to side effects. The record reflects that the claimant testified that both Dr. Spencer and Dr. Mumford prescribed these medications. On all three medication reports, the claimant listed only Dr. Mumford as the prescribing physician. It is true that "[a]n ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir.1996). This duty applies even when, like here, the plaintiff is represented by counsel. *See Baca v. Department of Health & Human Servs.*, 5 F.3d 476, 479–80 (10th Cir.1993).

Here, counsel for claimant did not indicate during the hearing that any additional medical records from Dr. Spencer should be sought in support of his testimony. The administrative record shows that the claimant and her counsel were aware that additional medical records could be submitted if necessary. Indeed, the claimant's attorney did submit additional exhibits and corresponded with the ALJ following the hearing. At no time did the claimant or her counsel request help from the Commissioner in obtaining any medical records. *See* 20 C.F.R. § 404.1512(d). Because the claimant was "represented by counsel at the administrative hearing, the ALJ [was] entitled to rely on [claimant's] counsel to structure and present [his] case in a way that [claimant's] claims [were] adequately explored." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir.1997).

The court finds that the ALJ did not fail in his duty to develop the record by not contacting Dr. Spencer for additional medical records. The ALJ reasonably relied on the claimant's representations that Dr. Mumford had prescribed the medications. The ALJ also was entitled to rely on the claimant's counsel to present his client's case so as to insure the claims were ade-

quately explored and as to identify those issues requiring further development. *See Hawkins*, 113 F.3d at 1167. The ALJ does not have a duty under the circumstances to act as the claimant's advocate. *See Henrie v. United States Dep't of Health & Human Services*, 13 F.3d 359, 361 (10th Cir.1993). The claimant does not make any representation that the result of the disability proceedings would have been different if Dr. Spencer's medical records had been presented.

*Is the vocational expert's testimony flawed as being contradicted by the Dictionary of Occupational Titles ("DOT") and in being based on inadequate details concerning sit/stand option?*

■ In a case, like this one, where the claimant's ability to do the full range of sedentary work is limited due to some restriction, "the ALJ must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual lives or in several regions of the country." *Haddock v. Apfel*, 183 F.3d 1225, 1228 (10th Cir.1999) (quotation omitted). At step five, by regulation, " '[w]hen the agency determines that unskilled, sedentary, light, and medium jobs exist in the national economy ..., [the agency] will take administrative notice of reliable job information available from various governmental and other publications[, including the] Dictionary of Occupational Titles.' " *Haddock*, 183 F.3d at 1228 (quoting 20 C.F.R. § 404.1566(d)(1)). The Tenth Circuit understands this regulation to mean that an ALJ "must correlate a VE's [vocational expert's] testimony in an individual case with vocational information provided in the Dictionary of Occupational Titles or other reliable publications." *Id.* at 1228–29.

In conclusory fashion, the claimant contends the vocational expert identified some jobs for the claimant that actually exceeded the sedentary level of exertion or that were skilled or semi-skilled when the evidence was that the claimant had no transferable skills. Unfortunately, the claimant

does not say which of the jobs listed by the vocational expert fall within either category. The claimant, however, concedes the position of surveillance-system monitor met the sedentary and unskilled category. From its review of DOT, the court finds that the position of telephone solicitor (247.367–010) also falls within that category. The vocational expert testified as to the approximate number of jobs available, regionally and nationally, for each position she listed.

In *Haddock v. Apfel*, the Tenth Circuit recently held "that the ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability." 183 F.3d at 1231. In *Haddock*, the vocational expert grouped all of the possible positions in discussing the available number of jobs in regional and national economies. 183 F.3d at 1227. In the instant case, the ALJ knows specifically the number of telephone solicitor and security system monitor positions available regionally and nationally. Though DOT appears to contradict the vocational expert's testimony on possibly four of the six listed jobs, the specific testimony regarding the other two listed jobs constitutes substantial evidence in support of the ALJ's finding that "there are other jobs existing in significant numbers in the national economy which the claimant could perform." (Tr. 24). The court sees no need to remand this case for the ALJ to investigate this issue further.

■ The claimant's also argues that the ALJ's hypothetical failed to specify the frequency for his need to alternate sitting and standing as required by Social Security Ruling 96–9p, 1996 WL 374185, at *7, which reads in relevant part:

Alternate sitting and standing: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be ac-

commodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

In the hypothetical question asked here, the ALJ described this restriction in these terms, "that the claimant would further need an opportunity to-sit or stand during the course of a work day, essentially at his discretion so as to alleviate discomfort." (Tr. 206).

The claimant does not show that the ALJ could have been more specific in describing frequency based on the medical evidence of record at that time. Specificity is plainly a function of what evidence exists. In this case, the ALJ was as specific as the record allowed him to be. Since the vocational expert was present during the claimant's testimony, the vocational expert necessarily interpreted this description in light of that testimony. Under these circumstances, the court finds no error.

*Are the ALJ's credibility findings concerning the plaintiff's allegations of pain supported by substantial evidence?*

■ "Generally, credibility determinations are the province of the ALJ, 'the individual optimally positioned to observe and assess witness credibility.'" *Adams v. Chater,* 93 F.3d 712, 715 (10th Cir.1996) (quoting *Casias v. Secretary of Health & Human Servs.,* 933 F.2d at 801). Consequently, a "court ordinarily defers to the ALJ as trier of fact on credibility, ... [but] deference is not an absolute rule." *Thompson v. Sullivan,* 987 F.2d at 1490 (citations omitted). It is "recognize[d] that

some claimants exaggerate symptoms for purposes of obtaining government benefits, and deference to the fact-finder's assessment of credibility is the general rule." *Frey v. Bowen,* 816 F.2d 508, 517 (10th Cir.1987). Thus, a court "will not upset such [credibility] determinations when supported by substantial evidence." *Bean v. Chater,* 77 F.3d 1210, 1213 (10th Cir.1995) (internal quotation omitted).

■ The plaintiff generally disputes the ALJ's finding that he is not disabled due to severe pain. " 'To establish disabling pain without explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony of pain evaluated by the ALJ and weighed alongside the medical evidence. An ALJ may not ignore the evidence and make no findings.' " *Kepler v. Chater,* 68 F.3d 387, 390 (10th Cir.1995) (quoting *Huston v. Bowen,* 838 F.2d at 1131 (citations omitted)). Where there is evidence of allegedly disabling pain, courts in the Tenth Circuit look to *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987), for the framework of proper analysis:

> "We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling."

*Kepler v. Chater,* 68 F.3d at 390 (quoting *Glass v. Shalala,* 43 F.3d at 1395). If objective medical evidence shows a pain-producing impairment, the ALJ then must consider the plaintiff's allegations of severe pain and decide whether he believes them. *Thompson v. Sullivan,* 987 F.2d at 1489. Factors to be considered at this point include:

> "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts,

the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of non-medical testimony and objective medical evidence."

*Kepler,* 68 F.3d at 391 (quoting *Thompson,* 987 F.2d at 1489).

■ The ALJ must link his credibility finding to substantial evidence, that is, the ALJ needs· to "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible." *Kepler,* 68 F.3d at 391. "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d at 1133 (footnote omitted). The "ALJ 'must articulate specific reasons for questioning the claimant's credibility' where subjective pain testimony is critical." *Kepler,* 68 F.3d at 391 (quoting *Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir.1992)).

■ The claimant contends that the ALJ did not properly account for the claimant's subjective complaints and did not properly inquire into the criteria relevant to this credibility determination. The ALJ's written decision reveals that he implicitly followed the procedure and considered many of the factors outlined in *Luna* in evaluating the credibility of the plaintiff's pain testimony. Though the ALJ's written decision could have discussed more of the *Luna* factors in greater detail, the simple failure to do so is not error in itself. *Bridgeford v. Chater,* 922 F.Supp. 449, 459 (D.Kan.1995).

The ALJ found the claimant's testimony "of a complete inability to work, because of pain, . . . [to be] not entirely credible." (Tr. 20). The ALJ gave the following reasons for his finding. The claimant's statements to his treating physician, Dr. Mumford, conflicted with the claimant's testimony. At the hearing, the claimant alleged serious side effects from his pain medication, the medical records do not show, however, that the claimant ever complained about these side effects to Dr. Mumford or asked for any adjustment in his medication. Another example of a conflict cited by the ALJ was between Dr. Mumford's notes which reflected that the epidural steroid injections were effective in alleviating the claimant's complaints of radiating pain and the claimant's testimony that the injections were ineffective. The ALJ next noted that Dr. Mumford followed a conservative course of treatment for the claimant's pain complaints that was "inconsistent" with the claimant's testimony of severe and disabling pain. The ALJ also observed that the medical evidence did not support the claimant's allegations of a restricted lifestyle. The ALJ wrote that the "objective medical evidence does not indicate that the claimant has a medical impairment associated with intense and disabling pain." (Tr. 21). Nor did the evidence of record show that these impairments could not be effectively treated with steroid injections. The ALJ found no evidence of precipitating or aggravating factors to the claimant's pain. Finally, the ALJ found that the claimant's employment history supported his credibility but was outweighed by the other evidence of record.

From its review of the record, the court finds substantial evidence supporting each of the factors addressed by the ALJ. The Tenth Circuit case law holds that such factors are properly considered by an ALJ in evaluating a claimant's subjective allegations of disabling pain. Inconsistencies in the claimant's testimony and his statements on other occasions are the proper subject for evaluating the plaintiff's credibility. *Bean v. Chater,* 77 F.3d at 1213. "[T]he extensiveness of attempts [medical or nonmedical] to obtain relief [and] the frequency of medical contacts" are relevant in evaluating subjective pain complaints. *Kepler v. Chater,* 68 F.3d at 391. Though not conclusive in weight, the absence of any treating physician's opinion that the claimant's conditions were disabl-

**1192**

ing is plainly relevant and proper for consideration. *See Kelley v. Chater,* 62 F.3d 335, 338 (10th Cir.1995). Likewise, it is relevant to consider that the treating physician prescribed only a conservative course of treatment for mild to moderate pain and did not describe the claimant's medical conditions in acute or severe terms. *See Talley v. Sullivan,* 908 F.2d 585, 587 (10th Cir.1990) (Claimant's testimony regarding severity of pain must be consistent with medical records). Finally, it is appropriate for the ALJ to consider the extent to which the medical evidence corroborates the existence of a claimed impairment, its severity, and the accompanying functional limitations. *See Luna,* 834 F.2d at 165. For all the reasons discussed above, the court concludes that the claimant has not presented any grounds for overturning the ALJ's credibility determination.

■ Although it is clear that claimant suffers some pain, "[d]isability requires more than mere inability to work without pain. To be disabling, pain must be so severe ... as to preclude any substantial gainful employment." *Gossett v. Bowen,* 862 F.2d at 807 (quotation omitted). On the points argued here, the record contains substantial evidence in support of the ALJ's finding that plaintiff's testimony regarding his pain and limitations was "not entirely credible" and that the plaintiff retained the RFC to perform a limited range of sedentary work. "Regardless of whether ... [the court] would have reached a different result based on the record," its review is limited to deciding whether substantial evidence sustains the Commissioner's decision. *Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir.1990) (citation omitted).

IT IS THEREFORE ORDERED that the Commissioner's decision denying the plaintiff's application for benefits is affirmed.