**Edgar L. THOMPSON, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

No. 99–1184.

United States District Court,
W.D. Tennessee,
Eastern Division.

March 8, 2001.

Bill R. Barron, Trenton, TN, Counsel for Plaintiff.

William W. Siler, Memphis, TN, Counsel for Defendant.

## REPORT AND RECOMMENDATION

BREEN, United States Magistrate Judge.

The plaintiff, Edgar L. Thompson ("Thompson"), appeals from a decision of the Commissioner of Social Security denying his application for disability insurance benefits. The appeal has been referred to the undersigned for report and recommendation.

### PROCEDURAL HISTORY

Thompson filed his application for disability insurance benefits on June 5, 1995 alleging disability having an onset date of February 15, 1995. (Transcript at pages 60–63, hereafter "TR-_____") The application was denied initially. (TR–58–59) The plaintiff filed another application for disability insurance benefits on June 3, 1996, alleging disability with an onset date of May 29, 1996. (TR–105–09) The application was denied initially and upon reconsideration. (TR–96–104, 110–14) The plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted by ALJ John J. Schule, III on January 17, 1997. (TR–94, 36–57) ALJ Schule denied plaintiff's application in a decision dated February 27, 1998. (TR–22–30) The ALJ's decision became the final decision of the Secretary when the Appeals Council denied Thompson's request for review on June 25, 1999. (TR–6–8) Plaintiff filed this action seeking review

of the final decision of the Secretary pursuant to 42 U.S.C. § 405(g). The claimant argues, on various bases which will be addressed in detail herein, that the ALJ's decision was not supported by substantial evidence.

## THE FIVE–STEP EVALUATION

██ A multi-step evaluation set forth in the Social Security Regulations (the "Regulations") is utilized to determine whether a claimant is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a) (2000). If it is found at any step in the analysis that the claimant is not disabled, the claim is not reviewed further. 20 C.F.R. §§ 404.1520(a) (2000). First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b) (2000). Second, he must suffer from a severe physical or mental impairment. 20 C.F.R. §§ 404.1520(c) (2000). The ALJ must at the third step determine whether the claimant has an impairment that meets or equals the criteria contained in the Regulations' Listing of Impairments set out in Appendix 1 thereto (the "Listings"). 20 C.F.R. §§ 404.1520(d) (2000). If a claimant's impairment meets or equals a Listing, he is found disabled. 20 C.F.R. §§ 404.1520(d) (2000). In the event the ALJ decides that a listed impairment has not been met or equaled, he must then move to the fourth step in the analysis and consider the claimant's residual functional capacity[1] and the physical and mental demands of his past relevant work. 20 C.F.R. §§ 404.1520(e) (2000). If the claimant is still capable of performing his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e) (2000). Upon a determination that the claimant cannot engage in his past relevant work, the ALJ must advance to the fifth and final step of the evaluation

and analyze whether the claimant can perform other work. 20 C.F.R. §§ 404.1520(f) (2000). In doing so, he is to consider residual functional capacity along with vocational factors including age, education, and past work experience. 20 C.F.R. §§ 404.1520(f) (2000). At this stage, the ALJ may employ the Medical–Vocational Guidelines (the "Grids") in reaching his determination. *Abbott v. Sullivan,* 905 F.2d 918, 926 (6th Cir.1990). If the ALJ concludes that there is no other work the claimant can perform, he is found to be disabled. 20 C.F.R. §§ 404.1520(f) (2000).

## THE ALJ'S DECISION

After considering the medical record, including the plaintiff's hearing testimony, the ALJ found that Thompson was not under a disability as defined in the Social Security Act (the "Act"). (TR–30) Utilizing the multi-step evaluation process set forth in the Regulations, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on May 29, 1996, the date the claimant stated he became unable to work, and continued to meet them through December 31, 2000.

2. The claimant has not engaged in substantial gainful activity since May 29, 1996.

3. The medical evidence establishes that the claimant has severe status post cervical discectomy and fusion times two, status post surgery for fracture of right hip, and borderline intellectual functioning, but that he does not have an impairment or combination of impairments listed in, or medically equal

---

1. "Residual functional capacity" is defined in the Regulations as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c) (2000).

to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's allegations are not fully credible.

5. The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for lifting and carrying more than 20 pounds occasionally and ten pounds frequently, standing, walking or sitting more than six hours in an eight hour workday, with frequent posturals except occasional climbing and handling (20 CFR 404.1545).

6. The claimant is unable to perform his past relevant work as a truck driver or furnace operator.

7. The claimant's residual functional capacity for the full range of light work is reduced by the restriction to occasional climbing and handling.

8. The claimant is 50 years old, which is defined as closely approaching advanced age (20 CFR 404.1563).

9. The claimant has a limited education (20 CFR 404.1564).

10. The claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work (20 CFR 404.1568).

11. Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 404.1569 and Rule 202.10, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. The claimant's capacity for light work has not been appreciably compromised by his nonexertional limitations. Accordingly, using the above cited rule as a framework for decisionmaking, the claimant is not disabled.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f)).

(TR–28–30)

## STANDARD OF REVIEW

Judicial review of the Secretary's decisions is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary employed the proper legal standards. Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. [The] court does not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.

In determining the existence of substantial evidence, [the] court must examine the administrative record as a whole. If the Secretary's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion.

*Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994) (internal citations omitted).

## THE CLAIMANT'S CONDITION

Thompson was born on October 22, 1947 and was 49 years old on the date of his disability hearing. He had completed the eleventh grade and had worked as a roll-up operator for a waste management company and as a melting furnace operator. He also served as a Marine in Vietnam. (TR–39–42)

The relevant medical records contained in the transcript began with records from August 14, 1992, when Thompson was treated at the Regional Hospital of Jackson, Tennessee following a fall from the back of a waste management truck. He suffered a laceration to the forehead and a comminuted intertrochanteric and subtrochanteric fracture of the right hip. Dr. Lowell Stonecipher, an orthopedic surgeon, performed an open reduction and internal fixation of the right hip with a Zimmer compression screw and 145 degree angle four hole side plate with medial displaced osteotomy. Physical examination conducted during his hospitalization was otherwise unremarkable. At the time of discharge on August 26, the claimant was ambulating without difficulty and instructed to perform straight leg raising and adduction and abduction exercises. Tylenol # 3 was prescribed for pain. (TR–161–79)

In September 1992, plaintiff was seen by Dr. Stonecipher at the hospital complaining of right hip and leg pain. The physician noted that he had informed Thompson at the time the August procedure was performed that he expected him to suffer from hip and groin pain as well as marked swelling. Examination revealed tenderness in the calf, marked swelling in the thigh, and a low grade fever. A right leg venogram revealed extensive deep vein thrombosis in the lower leg with nonvisualization of the popliteal or superifical femoral vein. The appearance was consistent with extensive deep vein thrombosis from the saphonal femoral junction to the ankle. Right leg venous ultrasound, conducted to confirm the presence of upper leg thrombosis, supported a finding of extensive deep vein thrombosis from the saphonal femoral junction to the popliteal with involvement of the popliteal as well, thus affirming that thrombosis was present in both the upper and lower leg. Physical examination was otherwise unremarkable.

He was admitted for treatment. During his hospitalization, which lasted some two weeks, the claimant was referred to Dr. Robert Dunnebacke for consultation because of a mild concussion along with left ventricular hypertrophy on an EKG. Dr. Dunnebacke reported that the patient was watched closely but did not exhibit hypertension during his hospital stay. Plaintiff was treated with medication, bedrest, and moist heat. On discharge, the claimant was afebrile and in much less pain. Swelling had decreased considerably. He was prescribed medications and instructed to continue straight leg raising, abduction, and adduction exercises. (TR–153–59)

Follow-up examinations indicated that the fracture was healing well. On October 30, 1992, plaintiff reported some groin pain. At that time, Dr. Stonecipher allowed Thompson to weight bear 20 to 25 pounds and noted that he was not exercising hard enough. It was Dr. Stonecipher's opinion following an evaluation in November 1992 that plaintiff would not be able to return to his regular work for eight months to a year, but that he would be able to perform lighter duty that involved sitting. Thompson was permitted to full weight bear and discontinue using crutches in December 1992, and was instructed to continue exercises. (TR–193–94) In January, Dr. Stonecipher noted that plaintiff had improved considerably with therapy, but continued to complain of pain. (TR–198) In February 1993, the claimant was still complaining of some problems with the hip area, but, as the physician noted, the leg muscles had built up very well. He further observed that a lift might be necessary for the right lower extremity, which was some one to one-and-one-quarter inches short. (TR–197)

According to the transcript, Thompson received treatment at The Rehab Clinic of Jackson from December 1992 to April

1993. Progress notes indicate that, over the course of treatment, the claimant reported a noticeable increase in strength and muscularity in the legs, but continued to complain of sharp "wedge" pain in the right hip and groin areas when attempting to adduct the right leg past the midline. An evaluation on April 5, 1993 reported that his calculated fitness level at that time was categorized as fair and that the right leg was 35.8 percent weaker concentrically and 32.5 percent weaker eccentrically than the left. (TR–180–82)

On February 16, 1993, Thompson was evaluated by Dr. Jere M. Disney of the East Memphis Orthopedic Group relative to his hip fracture. She noted that, at the time of the examination, the claimant had been full weight bearing without external support for approximately six weeks and was complaining of pain about the left hip and on adduction. Examination revealed a well-developed male in no acute distress who walked with a cane and tended to bring his body over his involved hip with ambulation. The patient was able to dress, undress, and move to and from the examining table. The physician noted approximately one inch of shortening to the left lower extremity. Range of motion was from 90 degrees of flexion to full extension with approximately ten degrees of adduction, 30 degrees of abduction, and about 2+ internal and external rotation. X-rays indicated a healed intertrochanteric fracture of the left proximal femur with a compression screw in place. The proximal femoral shaft was medially displaced one and one-half inches. Dr. Disney recommended a three-quarter inch heel lift on the involved side. It was her opinion that the plaintiff's gait would improve with time, although he would likely have a permanent limp. Additional surgery was not recommended. The physician measured claimant's partial disability at 15 to 20 percent of the extremity. (TR–191–92)

In a letter dated March 5, 1993, Dr. Disney stated that the plaintiff had reached maximum benefit from medical treatment and was in need of no specific active treatment other than walking. (TR–190) On March 30, 1993, Dr. Disney reported that she doubted Thompson would be able to return to a job which involved climbing on and off a truck. Rather, it was her opinion that the most he could perform was light or sedentary work on a trial basis for approximately three months. Eventually, she predicted, he would be able to do whatever work he could tolerate. (TR–189) Dr. Disney completed a medical assessment form in June 1993 in which she opined that the claimant could occasionally lift 20 pounds, stand and/or walk at least two hours in an eight-hour workday, and sit approximately six hours in an eight-hour workday. (TR–184–85)

On August 10, 1993, Thompson was examined by Dr. Glenn Barnett, a neurosurgeon, after being referred by Semmes–Murphey Clinic in Memphis. He noted that an MRI conducted the previous day at Semmes–Murphey revealed a C6 disc herniation of a sizeable degree on the right side. An EMG/NCS performed of the right arm by Dr. Barnett was abnormal. The patient complained of neck and intrascapular pain, as well as some bilateral shoulder pain with radiation into the arm. Pain was generally on the right but occurred on the left as well. Physical examination indicated a markedly decreased range of flexion and extension in the neck producing pain in the intrascapular region as did lateral rotation to either side. Thompson also had a slightly decreased range of motion in his lower back and a negative straight leg raising at 90 degrees bilaterally. Motor examination showed mild weakness of the right triceps with a basically absent to decreased right triceps reflex compared to the left. Sensation was

intact in the upper extremities. Neurological examination of the lower extremities was unremarkable. According to Dr. Barnett, the claimant's neurological deficit was minimal. (TR–230–32)

After reviewing Thompson's MRI in detail, Dr. Barnett concluded on August 16, 1993 that the results indicated a large extruded C6 disc on the right and an L5 disc on the left in the lumbar region. (TR–229) The plaintiff returned to Dr. Barnett a month later, stating that he was still at work but suffered from pain in his neck on the right side, right shoulder, back, and legs. The physician attempted to assure him that "there was no acute problem" and noted that, depending on his degree of pain, plaintiff might elect to have surgery. (TR–228) In October, plaintiff complained that he was having little success with working due to pain in his neck and both shoulders. He also reported occasional arm discomfort and low back pain with standing. Dr. Barnett again spoke with the patient regarding surgery to alleviate his symptoms. (TR–227) In November 1993, Thompson was admitted to Jackson–Madison County General Hospital for an anterior cervical diskectomy with allograft fusion of C6–7. The plaintiff had improvement in arm pain and some remaining soreness of the neck postoperatively. On discharge, he was without fever and recovering well from the surgery. (TR–195)

In December 1993, the claimant visited Dr. Barnett with multiple complaints of pain in his neck and shoulders, as well as his right hip and upper leg. In addition, he had developed some left arm radicular symptomatology from which he had not suffered previously. (TR–226) Thompson returned to Dr. Barnett in January 1994 feeling better. He was able to flex and laterally rotate his neck to the right but still had some intermittent numbness and tingling in the left arm as well as signifi-

cant problems with the right hip. Dr. Barnett believed that the claimant would be able to return to his work in a month, at which time the physician expected his patient to reach the point of maximum improvement from the neck surgery. Dr. Barnett referred Thompson to another orthopedic surgeon, Dr. Jim Craig, for a consultation on whether anything further could be done to improve the angulation of his leg and hip. (TR–225) After being examined by Dr. Craig, the plaintiff reported to Dr. Barnett on February 7, 1994 that the consulting physician had x-rayed his hip and informed him that it had healed properly and that there was nothing further to be done. At that time, Dr. Barnett noted that his patient was receiving therapy for the neck which seemed to be helping. Although he also complained of some pain in the spinal axis, the doctor concluded that, overall, "this [was] settling down nicely." (TR–224)

During an office visit in March 1994, plaintiff continued to complain of pain in his right hip and knee. The physician noted that he had been unsuccessful in obtaining further evaluations or treatment for those problems but had benefitted from work hardening therapy. Neck pain had decreased since the neck operation. It was Dr. Barnett's opinion that Thompson had a 10 percent impairment to his body as a whole due to his neck problems. He released the claimant to return to work without restriction as of March 7. (TR–223) In April, plaintiff again visited Dr. Barnett with numerous complaints, including neck pain and soreness; swollen and "crick like" feelings in the neck; pain between the shoulder blades; numbness of the arms at night upon lying down; and hip, low back, and left leg pain. He was treated with medication and instructed to return on an as-needed basis and continue working as best he could. (TR–222)

Thompson was again examined by Dr. Stonecipher in May 1994, complaining that he could not cross his legs, had severe pain in the upper thigh area, and that his leg was crooked. The doctor noted that the patient could hardly get off the examining table. Measurements indicated that the claimant was symmetrical. He was, however, one inch short on the right lower extremity compared to the left. Although plaintiff appeared to have a little valgus deformity in the knee, standing x-rays revealed no difference in the valgus on one knee in the tibial area compared to the other. No arthritis was noted. X-rays also exhibited a well-healed hip fracture. Range of motion of the hip was normal. The physician measured plaintiff's impairment at that time at 15 percent to the lower extremity secondary to the shortening and a very mild limitation of adduction. (TR–197)

On February, 16, 1995, the plaintiff visited Dr. Barnett, who had not examined him since April 1994. Thompson complained of neck and left shoulder pain down the left arm, along with throbbing discomfort. Examination revealed a moderately uncomfortable but quite strong individual with good range of motion in the neck and shoulders, normal deep tendon reflexes and sensation, and no focal weakness. It was Dr. Barnett's opinion that plaintiff had suffered only a strain, which he treated with medication and physical therapy. He opined that plaintiff would be able to return to work. (TR–221) Some two weeks later, Thompson returned to Dr. Barnett, complaining that his shoulder and arm pain had worsened. The physician noted scapular pain, pain down the arm, and neck pain, which he treated with medication. (TR–220) Dr. Barnett again examined the claimant in March in response to continued complaints of left shoulder and arm pain. An MRI failed to clearly show a cause for the plaintiff's symptoms. Thompson was admitted to the hospital for a myelogram and CAT scan, both of which were consistent with a herniated C5 disk, paracentrally, left of the midline. The claimant was advised that his options were to live with the problem or undergo surgical intervention similar to that performed in 1993. (TR–212–13, 219)

Thompson was referred to Dr. D.J. Canale for an independent medical evaluation, which was conducted on March 23, 1995. Neurologic examination revealed limited range of motion of the neck with pain on both flexion and extension. There was some mild variable hypalgesia over the radial aspect of the lower forearm and no definite weakness in either upper extremity. Biceps reflexes were 1–2+ and equal with triceps reflexes at 1+ and equal. Brachioradial reflexes were absent and pateller reflexes were 1+ and equal. Dr. Canale concluded that Thompson had developed a new disc herniation at C5–6 on the left, which had been present for about five weeks and which had not improved despite conservative therapy. He recommended another anterior cervical diskectomy and intebody fusion at C5–6. (TR–250)

The procedure was performed in May 1995 and, according to the discharge summary, Thompson tolerated the procedure well. (TR–236) The results of a pathology report on the disc material indicated "degenerating fibrocartilaginous tissue consistent with origin in herniated nucleus pulposus." (TR–240) Post-operative examinations were favorable. X-rays of the cervical spine taken May 31, 1995 showed that the graft was in excellent position. (TR–245–47) Progress x-rays of the same area on August 10, 1995 exhibited an excellent fusion between C5–6 and C6–7. Thompson was encouraged to walk and increase his activity to alleviate low back pain. (TR–244) Notes from a post-operative visit to Dr. Canale three weeks later revealed some soreness in the neck and

numbness under the chin on the right, which was not unusual. The physician released Thompson to return to work on September 5 and opined that he had not incurred any additional permanent physical impairment. (TR–243)

In a pain questionnaire completed on June 13, 1995, Thompson stated that he suffered from continuously worsening pain and soreness in his neck, shoulder, and hip areas. The neck and shoulder pain caused nausea and back pain radiated into both legs. Pain was constant but more pronounced with body movements involving sitting, standing, or lying in various positions for a long period of time or while bending, stooping, walking, or going up or down stairs. Thompson reported taking Lortab, Darvocet–N, Toradol, Extra–Strength Tylenol, and Aleve for the pain, which would subside for several hours and then return. He reported that these medications produced side effects nervousness and "cloudy" thoughts. He was also prescribed muscle relaxers Carisoprodol and Daypro. According to the plaintiff, the pain made it difficult to dress himself, shower, get into and out of the car and the bathtub, walk, and bend. The pain also caused discomfort during television watching and sexual activity. Cold, rainy weather aggravated the condition. He related that he most often rested by sitting in his recliner, drove only when necessary, did not socialize, and was assisted in shopping and household chores by friends and family. (TR–76–79)

In a letter to attorney David Hardee on February 1, 1996, Dr. Barnett related that the plaintiff had visited his office on January 31, 1996. He stated that Thompson felt that his lower back and neck were worse than they have been at the time of Dr. Barnett's September 1993 evaluation.

The claimant complained particularly of pain going down his arm and of pain, numbness, and weakness in his hand. No specific radicular origin or pattern were given for the numbness and pain. Physical examination uncovered an almost 50 percent loss of grip in the left hand. Dr. Barnett concluded that plaintiff had a nine percent impairment from the first surgery, two percent from the second, and a ten percent loss of the left arm due to weakness. (TR–254–55) Dr. Barnett again examined the claimant on June 5, 1996 on complaints of increasing pain in the neck and left shoulder, along with muscle spasms in the neck, limited neck motion, and slight numbness in the fingertips. Therefore, the physician opined, based on the Orthopaedic Guidelines, that plaintiff suffered from a 20 percent impairment to the whole body. (TR–256)

Thompson completed another pain questionnaire in June 1996, in which he reported pain behind the eyes and in the front and top of the head, upper and lower back, neck, shoulders, right hip and leg, and right knee. Neck and shoulder pain created numbness in the arms and hands and lower back pain radiated down the legs. The pain worsened with body movements, including raising his arms, sitting, standing, lying in different positions, bending, stooping, and walking up and down stairs. The plaintiff related that he suffered from severe pain for days or weeks at a time whether he engaged in strenuous activity or not. He continued to take the same medications listed in the 1995 pain questionnaire and suffered the same side effects. In addition, the claimant reported memory difficulties associated with the medications.[2] His limitations were the same as those set forth in the 1995 pain

---

2. The medications which plaintiff stated produced side effects in the June 1996 questionnaire were the same as those listed in the

form completed in 1995 and included Lortab, Toradol, Darvocet, Daypro, Aleve, and Extra–Strength Tylenol.

questionnaire. He added that his pain, both physical and mental, had become so unbearable he could not perform his job duties. (TR–133–36)

In the late summer and early fall of 1996, plaintiff was evaluated by The Kelley Psychiatric Clinic in Paducah, Kentucky. According to the intake report, Thompson had struck up a conversation in his Jackson, Tennessee doctor's office waiting room with a Vietnam veteran from Paducah who told him about the federal Vet Center program. Following that conversation, the claimant self-referred to the clinic for possible treatment through the program. R. Gordon Williams, Ph.D., a clinical psychologist, concluded upon interviewing Thompson that he appeared to be experiencing rather significant ongoing post-traumatic stress symptoms. The claimant reported ongoing Vietnam related nightmares and daytime flashbacks and ongoing sensitivity to changes in the weather, loud noises, and other Vietnam related memories. He also described withdrawal from previously enjoyable activities as his physical and mental conditions deteriorated. Mood appeared to be one of both anxiety and depression and thought processes were generally intact with some attentional and concentration difficulties. No psychotic disturbance was noted. Dr. Williams recommended ongoing supportive outpatient psychotherapy, psychochemotherapy, and further investigation into plaintiff's claims of exposure to dioxin. Dr. Williams further noted that the claimant's ability to maintain gainful employment appeared to be seriously compromised. (TR–271–73)

On April 11, 1997, Dr. Robert Kennon, a psychologist, performed a mental status examination at the request of the state disability agency. Dr. Kennon observed that the plaintiff was generally cooperative, relatively calm, talkative, and displayed no evidence of rocking, pacing, fidgeting, tremors, tics, or compulsions. He stated that he was sick to his stomach secondary to medications. The claimant related that he lived alone, depended on his family to perform cooking chores, received assistance with daily care from his sister, did not participate in social activities, drove on a limited basis, grocery shopped, and did not exercise or engage in hobbies. He enjoyed watching television and listening to the stereo. It was Dr. Kennon's opinion that the plaintiff was quite capable of managing his resources.

Thompson admitted to feelings of stress, withdrawal, anxiety, restlessness, and of being overwhelmed. He also admitted reduced libido. The stress he associated with his physical complaints. Indeed, during the evaluation, he often grimaced as if in pain. His mood was sullen and affect was mildly constricted. There was no incongruence of emotion to ideation and life events, and no history of significant depressive symptomatology. The claimant denied appetite disturbance and stated that he often just sat around and ate. He also denied panic attack features and suicidal ideation, plan, or intent. In this regard, Dr. Kennon noted that he did not detect any significant evidence of depressive features that would suggest a major depressive disorder. Plaintiff exhibited a great deal of somatic preoccupation. He reported that his skin crawled, he had trouble sleeping, which Dr. Kennon concluded was directly related to his pain, and he was very nervous.

The psychologist noted some mild thought blocking with sudden cessation in the train of thought. Productivity was otherwise normal, stream of thought was logical and clear, and state of consciousness was clear. Attention span appeared to be balanced. Communication was coherent and there was no evidence of any psychotic features, thought fragmentation,

loosening of associations, incoherence, or thought derailment. Content of speech and thought indicated no bizarre thoughts, grandiosity, ideas of reference, delusions, obsessive/compulsive features, or any other abnormality. Insight into self functioning was fairly good and there were no misperceptions of role or meaning, illusions, nor auditory/visual hallucinations. The plaintiff was oriented as to time, place, and person. From a cognitive standpoint, he appeared to be functioning at the low to average range of intellectual abilities. Memory functions were intact and recent remote and immediate memory recall were adequate. There was no evidence of negativism or oppositional or psychotic features. Some idiographic bending of reality was observed but there was not a great deal of distortion. The psychologist noted that Thompson's level of preoccupation with his physical functions might be so elevated as to create a pain response at a much higher level that would otherwise be expected.

Results of Wechsler Adult Intelligent Scale–Revised showed a verbal IQ of 76, a performance IQ of 87, and a full scale IQ of 81, which fell into the low average range of intellectual functioning. Rorschach Psychodiagnostic Technique Data demonstrated a total R of 13, with almost all plaintiff's responses to the cards referring to parts of the human anatomy, indicating to the evaluator his preoccupation with his physical functioning.

Based on his examination and testing, Dr. Kennon did not detect any significant impairments in plaintiff's ability to follow work rules or a history of problems in relating to fellow workers, using judgment with the public, or dealing with the public. Thompson was likely, however, to have some potential problems with dealing effectively with work stressors because he was quite overwhelmed. It was Dr. Kennon's opinion that the claimant could func-

tion independently. He displayed no significant impairment of his ability to sustain concentration and attention, carry out simple job instructions, maintain personal appearance, relate predictably in social situations, or demonstrate reliability. There might, he opined, be some difficulty in carrying out complex instructions or detailed, but not complex, instructions from time to time. Behaving in an emotionally stable manner might also be difficult as the plaintiff was quite fearful and anxious in social situations. (TR–274–81)

In a medical source statement, Dr. Kennon rated plaintiff's ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, function independently, and maintain attention and concentration as good. Ability to understand detailed job instructions, maintain personal appearance, relate predictably in social situations, and demonstrate reliability were also good. His ability to use judgment with the public was good to very good. Capability in dealing with work stresses and carrying out complex job instructions was fair. Ability to behave in an emotionally stable manner was fair to poor. (TR–282–84)

The plaintiff was also examined on April 17, 1997 by an orthopedist at the request of the state disability agency. According to the report submitted by Dr. Paul H. Williams of Memphis Orthopedic Associates, Thompson moved slowly and complained bitterly of pain with simple movements and tenderness over the posterior cervical spine in the distal half, over the L4–5, S1 area of the low back, and over the right hip generally. Examination revealed full range of motion in the cervical spine with no muscle spasm; normal reflexes, sensation and motor power in upper and low extremities; full range of motion in the right hip despite complaints of pain; no atrophy of the lower and upper extrem-

ities with normal reflexes; and normal grasp in both upper extremities. In the low back he had 3+ flexion, 1+ extension, and 2+ right and left lateral bending with bilateral lumbar muscle spasm present. Dr. Williams noted that the claimant was nervous during the examination. It was the physician's conclusion that Thompson had strong subjective complaints and indeed had some impairment, but, as it appeared to the physician that he was maximizing his complaints to some degree, the plaintiff was very difficult to evaluate. In support of this finding, Dr. Williams noted that there was no atrophy of either extremity, indicating that they were regularly used. He opined that the claimant was capable of standing and walking for at least two hours in an eight hour workday, sitting for six hours, lifting 20 pounds frequently and 50 pounds occasionally. Dr. Williams found that Thompson could not work at heights or lift heavy objects overhead. Excessive lifting, bending, stooping, and squatting would be difficult. (TR–285–87) In a medical assessment completed the day of the examination, Dr. Williams indicated that the claimant could lift ten pounds frequently and that sitting was not affected by his impairment. He further noted that Thompson's impairment affected his ability to push and pull, work at heights, move heavy machinery, and work in an extremely cold climate. (TR–288–90)

A psychiatric evaluation was performed on April 18, 1997 by John M. Kington, M.D. Upon examination of the plaintiff, Dr. Kington stated as follows:

Mental status examination can be summarized as being essentially within normal limits. I could find absolutely no indication of any abnormality in this gentleman whatsoever other than his claim that he was anxious and had a little trouble sleeping. His appearance and conversation were all appropriate. He showed no memory problems. He had no thinking abnormality. He had a normally responsive affect. His mood was authymic. He showed no type of psychomotor disturbance. He had no hallucinosis or delusion. There was no psychotic symptomatology. He had normal behavior. He denied either using alcohol or tobacco products. It was estimated that he has a normal intelligence level.

The psychiatrist further noted that Thompson was able to perform work from a psychiatric standpoint with good sustainability and could be expected to follow through on a job and go on to new tasks as deemed necessary. The claimant was considered to be very capable of relating to others and of managing his affairs. At worst, he could be diagnosed as having an anxiety disorder but, in Dr. Kington's opinion, there was no evidence of significant anxiety. (TR–291–93)

In a treatment update report dated August 21, 1997,[3] Dr. Gordon Williams of The Kelley Psychiatric Clinic stated that Thompson had been participating in a psychotherapy process on a monthly basis over the preceding year and had attended 12 sessions, with the last occurring on the date of the report. According to Dr. Williams, the plaintiff continued to demonstrate significant post-traumatic stress symptoms despite on-going psychotherapy. The patient continued to report an irritable, tense orientation during the day with periodic preoccupation with Vietnam experiences and war-related nightmares that caused significant sleep disturbance. Concentration and attentional difficulties re-

**3.** It appears from the record that this letter was submitted for the first time to the Appeals Council.

mained present as did a generally withdrawn stance in relationships with others. A severe social and industrial impairment was also indicated. (TR–296–97)

In a letter written June 17, 1998[4] at the request of plaintiff, Dr. Dunnebacke reported that Thompson's pain syndrome appeared to be worsening. The pain syndrome arose, in the physician's opinion, from a "combination of orthopedic and neurosurgical anomalies of his cervical spine and also lumbar spine and right hip." He described the pain as "quite severe with multiple difference types of complaint[s]," which made the claimant's quality of life poor. The plaintiff also required numerous pain medications and muscle relaxers in order to ease his symptoms. Dr. Dunnebacke recommended that Thompson see a neurosurgeon to ascertain whether further cervical spine surgery was appropriate. The plaintiff's remaining problems could not, in the physician's opinion, be alleviated by surgery, but must be controlled by medication. (TR–298)

In the hearing before the ALJ, Thompson testified that, in addition to his neck surgeries and broken hip, he had suffered from a bad blood clot down to his knee that swelled and caused pain. (TR–42–43) He complained of constant pain in his leg and neck that became worse when he "[got] up to try and do something." (TR–44) The pain in his shoulders caused sleeping difficulties. He was unable to perform household chores, could sit or stand for 15 to 30 minutes at a time, and could not lift at all. The plaintiff reported being able to walk to the mailbox and trying to push himself to walk more for exercise. (TR–44–47). Thompson related that he spent his days watching television and nodding off occasionally. While he had hunted with his dogs in the past, he could no longer participate in that activity. (TR–47–48) When asked if he was being treated for psychiatric problems, the claimant said that his nerves were "gone." (TR–49) He reported having Vietnam flashbacks "pretty regular" at night. When a flashback occurred and he awakened, he would come to himself and be all right. (TR–49–50) The plaintiff testified that he supposed it was something he had to live with and that he tried to go on and have a normal life. (TR–50) He related that he served in Vietnam for four months before being injured by shrapnel in the right ear. (TR–51–52)

## THE PLAINTIFF'S ARGUMENTS

In the brief presented to the court, Thompson contends, as stated previously, that the ALJ erred in (1) failing to conclude that he suffered from a mental impairment; (2) finding that plaintiff's statements were not credible; (3) failing to consider the side effects of medications; and (4) relying on the Grid in making a determination that plaintiff was not disabled. The court will address each of plaintiff's assignments of error seriatim.

First, plaintiff suggests that the ALJ failed to properly assess and evaluate his alleged mental impairments of depression, anxiety, and post-traumatic stress disorder. Specifically, he insists that the ALJ erroneously relied on the opinions of Drs. Paul Williams and John Kington, both non-treating, consultative physicians, in finding that no mental impairment existed. Such reliance, Thompson asserts, on "a one time visit by a non-treating physician should constitute error at law when the Administrative Law Judge based his opinion on such limited examination." Rather, plaintiff contends that the opinions and records of Dr. Gordon Williams of The Kelley Psy-

---

4. This letter was prepared after the ALJ's opinion was rendered and was submitted for the first time to the Appeals Council.

chiatric Clinic and Dr. Kennon support the existence of a mental impairment and that the impairment met the Listings for mental disorders. The court notes initially that, according to the record, Dr. Paul Williams, an orthopedist, conducted a consultative examination of the plaintiff with respect to his neck and hip pain. This physician gave no opinion whatever concerning plaintiff's mental state, other than to note in passing that he appeared nervous throughout the evaluation. In addition, Dr. Kennon, on whom the plaintiff argues the ALJ should have relied instead of a non-treating consultative physician, himself conducted a consultative examination on the plaintiff and, according to the record, saw him only on one occasion.

In his opinion, the ALJ summarized in detail the reports and findings submitted by Drs. Kennon, Gordon Williams, and Kington and determined that, although

> there were diagnoses of post traumatic stress disorder and generalized anxiety, Dr. Kington, the psychiatric examiner, found no mental impairments, and the claimant has not sought any mental health treatment beyond the intake evaluation by Dr. Gordon Williams.... Therefore, the undersigned has relied on Dr. Kington's assessment in evaluating any mental impairments.

(TR–27–28) The ALJ also completed a Psychiatric Review Technique Form (PRTF), in which he rated plaintiff's restrictions of activities of daily living as "slight"; his difficulties in maintaining social functioning as "slight"; his deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner as "seldom"; and the incidence of episodes of deterioration in work settings which cause him to withdraw or experience exacerbation of signs and symptoms as "never." (TR–32–33) The ALJ did not find that plaintiff suffered from a severe impairment based on de-

pression, anxiety, and post-traumatic stress disorder. (TR–23)

■ "To qualify for benefits, the claimant has the burden of establishing disability and must show by medically acceptable diagnostic techniques that [he] has an impairment and that the impairment is severe enough to preclude [him] from engaging in any substantial gainful employment." *Hathaway v. Commissioner of Soc. Sec.,* No. 99–6516, 2000 WL 1800484, at *5 (6th Cir. Nov.28, 2000). The Regulations set forth a specific procedure for determining the existence of mental impairments. The ALJ is to first determine whether a mental impairment exists by carefully reviewing the evidence, including a mental status examination and psychiatric history, and the conclusions supported thereby. 20 C.F.R. § 404.1520a(b)(1) (2000). A mental impairment must be "established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508 (2000). Psychiatric "signs" are "medically demonstrable phenomena which indicate specific abnormalities of behavior, affect, thought, memory, orientation and contact with reality. They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b) (2000). "Laboratory findings" in the context of this case are "psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques," including psychological tests. 20 C.F.R. § 404.1528(c) (2000).

■ If it is determined that a mental impairment exists, the Secretary must then indicate whether certain medical findings relevant to the claimant's ability to work are present. 20 C.F.R. § 404.1520a(b)(2) (2000). This procedure requires rating of the degree of functional

loss resulting from the impairment. Four areas of functioning are considered, including activities of daily living; social functioning; concentration, persistence, and pace; and deterioration or decomposition in the work setting. The degree of functional loss in each of these areas is rated on a scale ranging from no limitation to a level of severity which is incompatible with the ability to perform work-related functions. *Id.* If the degree of limitation is rated as "none" or "slight" in the first two areas, "never" or "seldom" in the third, and "never" in the fourth area, the Secretary "can generally conclude that the impairment is not severe, unless the evidence otherwise indicates there is significant limitation of [the claimant's] mental ability to do basic work activities." 20 C.F.R. § 404.1520a(c)(1) (2000). A mental impairment is not severe "if it does not significantly limit [the claimant's] ... mental ability to do basic work activities." 20 C.F.R. § 404.1521(a) (2000). If the mental impairment is severe, the Secretary then must determine whether it meets or equals a listed mental disorder. 20 C.F.R. § 404.1520a(c)(2) (2000). The Regulation also requires that a PRTF be prepared. 20 C.F.R. § 404.1520a(d) (2000).

■ Based on his examination, Dr. Kennon reported that he could not detect any significant evidence of depressive features suggestive of a major depressive disorder. Psychological testing revealed lower average intellectual functioning but no significant impairment in Thompson's ability to follow work rules, deal with the public, use judgment, relate to others, function independently, sustain concentration and attention, maintain personal appearance, follow simple job instructions, relate predictably in social situations, or demonstrate reliability. Dr. Kennon did note, however, that potential problems existed concerning the claimant's ability to deal effectively with work stressors and to behave in an emotionally stable manner. Dr. Kington

opined that his mental status examination of the plaintiff revealed no abnormalities other than his claims of anxiousness and sleep difficulties. The psychiatrist concluded that, at worst, plaintiff could be diagnosed with an anxiety disorder but there was no evidence of significant anxiety. In his intake report, Dr. Gordon Williams of The Kelley Psychiatric Clinic concluded, based only on an initial interview, that Thompson appeared to be experiencing rather significant post-traumatic stress symptoms and that his mood appeared to be one of anxiety and depression. Thought processes were generally intact and no psychotic disturbance was noted. Dr. Williams performed no testing at that time but recommended therapy. At the disability hearing, the claimant testified that his nerves were "gone" and that he had regular nighttime flashbacks to Vietnam experiences but that he would be fine once he awakened. Upon consideration of this evidence, the ALJ concluded that no mental impairment existed. The ALJ's ratings of the plaintiff's mental impairments on the PRTF are in line with the information before him. It is the opinion of the undersigned that, taking the record as a whole, a finding by the ALJ that plaintiff did not suffer from a severe impairment based on anxiety, depression, or post-traumatic stress disorder was supported by substantial evidence.

■ In reaching his conclusions, the ALJ noted that claimant did not seek mental health treatment after the initial intake interview with Dr. Gordon Williams. Although the record contains a report dated August 21, 1997 from Dr. Gordon Williams, which has been summarized herein, indicating that plaintiff received psychotherapy on a monthly basis for approximately a year following the initial intake interview, along with psychochemotherapy, and that he continued to suffer

from post-traumatic stress disorder resulting in severe social and industrial impairment, the information contained therein was not part of the record before the ALJ. Rather, it was provided for the first time to the Appeals Council, which determined that it did not provide a basis for changing the hearing decision. It is well-settled in this circuit that a federal court may not uphold, modify, or reverse the decision of the ALJ based on evidence submitted first to the Appeals Council where the council declined to review the case on the merits. *See Cotton v. Sullivan,* 2 F.3d 692, 695–96 (6th Cir.1993); *see also Thurman v. Apfel,* No. 99–3587, 2000 WL 491673, at *5 (6th Cir. Apr.20, 2000); *Osburn v. Apfel,* No. 98–1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999), *cert. denied,* 528 U.S. 1191, 120 S.Ct. 1248, 146 L.Ed.2d 106 (2000). This is true even where, as here, the Appeals Council chose, in its denial of review, to discuss a particular piece of evidence presented to it first on appeal and found that the evidence did not provide a basis for changing the ALJ's decision. *See Osburn,* 1999 WL 503528, at *3–4; *Thompson v. Commissioner of Soc. Sec.,* No. 97–5873, 1998 WL 476231, at *2 (6th Cir. Aug.3, 1998); *Cline v. Secretary of Health & Human Servs.,* 875 F.Supp. 435, 439 (N.D.Ohio 1995), *aff'd,* 96 F.3d 146 (6th Cir.1996). The court may remand the matter for further administrative proceedings in light of the evidence, however, if the plaintiff establishes that it is new and material and that there is good cause for his failure to present it in the original proceeding. *Cline v. Commissioner of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir.1996). In this case, plaintiff has offered no argument that good cause exists. Therefore, the August 1997 report cannot be considered on appeal.

■ For similar reasons, the court cannot consider the rating decision by the Department of Veterans Affairs attached as an exhibit to plaintiff's brief, which ap-

parently was not submitted to the ALJ or to the Appeals Council. The court's review is limited to whether substantial evidence exists in the administrative record to support the ALJ's findings. *Brainard v. Secretary of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989). As was the case with Dr. Gordon Williams' report discussed above, plaintiff has offered no argument that remand is appropriate based on new evidence.

■ Plaintiff also asserts that the ALJ erred in finding that his testimony was not credible. As has previously been recognized, it is not for the court to make decisions concerning credibility. *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Commissioner of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir.1997). Credibility determinations by the ALJ are to be accorded great weight and deference, as the ALJ is in a position to observe the demeanor and credibility of a witness. However, that assessment must be supported by substantial evidence. *Id.* If the ALJ rejects a claimant's testimony as not credible, he must clearly articulate his reasons for so finding. *Felisky,* 35 F.3d at 1036.

■ "Subjective claims of disabling pain must be supported by objective medical evidence in order to serve as the basis of a finding of disability." *McCoy v. Chater,* 81 F.3d 44, 47 (6th Cir.1995), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2557, 135 L.Ed.2d 1075 (1996). Objective medical evidence, according to the Regulations, includes "anatomical, physiological, or psychological abnormalities which can be observed, apart from [a claimant's] statements," and "phenomena which can be shown by the use of medically acceptable

laboratory diagnostic techniques." 20 C.F.R. § 404.1528(b) & (c) (2000). A claimant's statements about pain or other symptoms are insufficient in themselves to establish disability. 20 C.F.R. § 404.1529(a) (2000). The Sixth Circuit has articulated the following standard for determination with regard to claims of disabling pain:

> In evaluating subjective complaints of disabling pain, this court looks to see whether there is objective medical evidence of an underlying medical condition, and if so, then 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Stanley v. Secretary of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir.1994) (citing *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986)). When the medical evidence demonstrates that a claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, the Secretary must evaluate the intensity and persistence of those symptoms in order to determine how they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c)(1) (2000). In making his determination, the Secretary is to consider daily activities; location, duration, frequency and intensity of symptoms; precipitating or aggravating factors; the type, dosage, effectiveness, and side effects of medications; treatment other than medications received for relief; other measures used to relieve symptoms; and other factors. 20 C.F.R. § 404.1529(c)(3) (2000). In finding that Thompson's claims were not fully credible, the ALJ stated only that "[a]lthough the evidence does support some limitation as a result of the claimant's back and hip injuries; he is not limited to the extent alleged. Drs. Kennon, Kington, and Williams all noted the claimant's preoccupation with symptomatology and pain." (TR–27) While the ALJ took note of the factors to be considered listed in 20 C.F.R. § 404.1529 and referred to claimant's testimony as to each, he made no attempt to evaluate plaintiff's subjective claims as to pain and other symptoms in light of the medical evidence. Nor did he articulate any reasons to support his determination that plaintiff's statements were not credible. Certainly, a preoccupation with pain does not in itself, in this court's view, militate a finding or in any way suggest that a claimant is a malingerer. Therefore, it is the opinion of the undersigned that the ALJ's determination that plaintiff's testimony, absent sufficient support therefor, is not supported by substantial evidence. It is the opinion of the undersigned that this matter be remanded to the ALJ for an articulation of his reasons for findings made concerning plaintiff's credibility.

Thompson further contends that the ALJ's determination that he did not suffer from side effects of his medication was not supported by substantial evidence. The plaintiff notes that the ALJ stated in his opinion that he took Alprazolim, Oxazepam, Hydrocodone with APAP, and Carisoprodol. Apparently, the claimant is not contending that this list of his medications was inaccurate or incomplete. Rather, he insists that "[i]t is obvious by reading testimony of the plaintiff at the hearing that his memory was dull and his answers confused. This in itself is a side effect of said medicines." (Br. in Supp. of Appeal at [unnumbered] p. 5) Plaintiff does not, however, point to any evidence in the record to suggest that he suffered from side effects of these medications and, indeed, there is none. Nor does he now, in fact, argue that

he actually suffered from side effects of these medications. There was no testimony adduced at the hearing indicating that plaintiff suffered from side effects and, according to the medical records, he never complained to his physicians concerning any effects of these medications. It is not error for an ALJ to conclude that side effects do not present a significant problem based on a lack of supporting evidence. *See Richmond v. Shalala,* 23 F.3d 1441, 1443 (8th Cir.1994); *Turner v. Apfel,* No. Civ. A. 97–1089–P–G, 2000 WL 205095, at *6 (S.D.Ala. Feb.4, 2000); *Godfrey v. Apfel,* 77 F.Supp.2d 1178, 1188 (D.Kan. 1999).

Finally,[5] the plaintiff alleges that the ALJ erred in relying on the Grid in determining that he was not disabled. As the Sixth Circuit explained in *Abbott,*

> [w]here the claimant suffers from an impairment limiting only his strength, the Secretary can satisfy his burden, without considering direct evidence of the availability of jobs the particular claimant can perform, through reference to the grid. The grid aids the Secretary in determining disability claims by allowing "administrative notice" to be taken of the existence of jobs in the national economy that those with particular combinations of [certain factors, including age, education, and work experience] are capable of performing. The grid is composed of rules, . . . each of which specifies whether a claimant with a particular combination of [factors] . . . will be found disabled or not disabled.

> \*     \*     \*     \*     \*     \*

The [Grid] take[s] account only of a claimant's "exertional" impairment; that is, "an impairment which manifests itself by limitations in meeting the strength requirements of jobs." Where a claimant suffers from an impairment that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness, manipulative restrictions, or heightened sensitivity to environmental contaminants, rote application of the grid is inappropriate.

*Abbott,* 905 F.2d at 926 (internal citations omitted). Thus, the Grid may not be utilized to preclude a finding of disability where the claimant suffers from a significant non-exertional impairment. *Id.* at 926–27. Under the Regulations, difficulties in handling and climbing are categorized as non-exertional impairments. 20 C.F.R. § 404.1569a(c)(1) (2000). In order for use of the Grid to be precluded, however, the non-exertional impairment must indeed be "significant." *See Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir.1990). As the court articulated in *Kimbrough v. Secretary of Health and Human Servs.,* 801 F.2d 794 (6th Cir.1986),

> it is *only* when the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate residual functional capacity level that nonexertional limitations must be taken into account and a nonguideline determination made. Therefore, the mere possibility of a nonexertional impairment is insufficient. Not even a minor nonexertional limitation is enough; the claimant

---

**5.** The court notes at this point that Thompson also contends that "[i]t was error for the Administrative Law Judge to find the plaintiff capable of doing light work, but at the same time acknowledging that disability is limited by exclusion of climbing and handling" and that "[d]ue to his disabling impairments, the

plaintiff lacks the ability to perform all aspects of any level of work." These allegations are puzzling, as it is clearly permissible under the Regulations for the ALJ to determine that a claimant is not capable of performing a full range of work at a given exertional level and still find that he is not disabled.

must show an impairment that significantly limits his ability to do a full range of work at a designated level.

*Kimbrough,* 801 F.2d at 796 (internal citations and quotations omitted) (emphasis in original). "[T]he determining factor is whether the alleged nonexertional impairment is severe enough to alter the conclusion that the claimant could do a full range" of work. *Cole v. Secretary of Health & Human Servs.,* 820 F.2d 768, 772 (6th Cir.1987). Reliance on the Grid in the face of non-exertional impairments requires reliable evidence demonstrating that the claimant's non-exertional limitations "do not significantly limit the range of work permitted by his exertional limitations." *Shelman v. Heckler,* 821 F.2d 316, 321–22 (6th Cir.1987). The ALJ may, in making this determination, rely on the assistance of a vocational expert. *Damron v. Secretary of Health & Human Servs.,* 778 F.2d 279, 282 (6th Cir.1985).

In this case, the ALJ stated in his opinion that "the evidence does support some limitation as a result of the claimant's back and hip injuries" and expressly concluded that Thompson's ability to perform a full range of light work was reduced by a restriction to only occasional climbing and handling (gross manipulation). This is inconsistent with his later finding that plaintiff's non-exertional impairments had not "appreciably compromised" his ability to perform light work and, therefore, use of the Grid as a framework for decisionmaking was appropriate. The ALJ does not in his opinion articulate the basis upon which his conclusion that plaintiff's non-exertional impairments were not significant rested, other than to suggest that Thompson's impairments were not as severe as he claimed. Nonetheless, the ALJ found that the impairment was sufficient enough to alter a conclusion that Thompson could perform a full range of light work, which, under the legal principles set forth above, renders rote use of the Grid inappropriate. Thus, the ALJ's use of the Grid is not supported by substantial evidence. Upon finding that plaintiff was unable to perform a full range of work due to significant non-exertional impairments, the ALJ was then required to determine whether a significant number of jobs remain in the economy which the claimant could perform based on some kind of reliable evidence, including the testimony of a vocational expert. *See id.* Thus, it is the opinion of the undersigned that this matter be remanded to the ALJ for reconsideration of his conclusions as to step five of the sequential analysis, which may include the taking of the testimony of a vocational expert.

Accordingly, based on the foregoing, it is RECOMMENDED that the decision of the ALJ, pursuant to sentence four of 42 U.S.C. § 405(g), be REVERSED and REMANDED to the Commissioner for further proceedings in accordance herewith.